IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IAN BRENNER, | : | Civil No. 3:22-cv-157 |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | (Magistrate Judge Bloom) |
| | : | |
| MICHAEL OVERMEYER, | : | |
| Superintendent, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

## MEMORANDUM OPINION[1]

## I.  Introduction

Ian Brenner, the petitioner, was twice convicted of first-degree murder and related crimes arising out of a shooting in York, Pennsylvania in 2005. Brenner has filed a petition for habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction and sentence on the basis that his second trial counsel rendered ineffective assistance. (Doc. 1). After consideration, we conclude that none of Brenner's claims warrant habeas relief. Accordingly, for the following reasons, we will deny his petition.

---

[1] We exercise plenary jurisdiction of this petition pursuant to 28 U.S.C. § 636 pursuant to the consent of all parties. (Doc. 13).

II.   <u>Statement of Facts and of the Case</u>

The factual background of the instant case was aptly summarized by the Pennsylvania Superior Court in its decision affirming the denial of Brenner's second petition for post-conviction relief:

> On October 9, 2005, Appellant himself was the victim of a shooting. Appellant was struck in the leg and arm. N.T. Jury Trial, 8/6/14, at 23. At the hospital, Appellant refused to provide the name of the friend who had driven him to the hospital and stated that he did not know who shot him. *Id.* at 24-25. After he left the hospital, Appellant declined to respond to officers when they attempted to speak further with him about the incident and the case was closed. *Id.* at 34. A few days prior to the subsequent retaliatory shooting that led to the convictions underlying this appeal, Apollonia Snyder overheard Appellant talking on a cellphone, stating that "he was going to pop Supreme when he seen him." *Id.* at 42. During the conversation, Appellant was handling a firearm in his lap. *Id.*
>
> Ten days later, at 9:30 p.m. on October 19, 2005, shots were fired outside of Allison's Bar in the City of York, resulting in the death of Anna Witter, who was struck by a ricocheting bullet. Anthony Zawadzinski and Alfonzo King were also shot, but survived. Alfonzo King had been standing near Jeffrey Mable a/k/a "Supreme," the person who was the shooter's apparent target. All of the victims were shot with the same firearm, which was never recovered.
>
> Police responded quickly, detaining multiple potential eyewitnesses on scene and in the immediate vicinity. Daniek Burns identified the shooter as Appellant, the target of the first shot as Supreme, and gave a description of the shooter's appearance. *See* N.T. Jury Trial, 8/5/14, at 402, 418, 437 (identifying Appellant, describing his outfit as a hoodie with

the hood up, white tee shirt underneath, blue jeans, and black shoes, and explaining that the shooter aimed at Supreme first). Other witnesses provided similar descriptions, but did not identify the shooter. *See* N.T. Jury Trial, 8/5/14, at 246 (Alfonzo King describing the shooter as tall, stocky, and wearing a dark hoodie); *see also* N.T. Jury Trial, 8/6/14, at 89-90 (explaining that while the lighting was good, Tina Ashley could not identify the shooter because he wore a gray hoodie with the hood up and had a dark complexion, but she was certain that the shooter was not Appellant); *id.* at 124-25 (Alicia Brittner describing the shooter as wearing jeans and a hoodie over the head, but that it was too dark to see who the shooter was); *id.* at 179-80 (Lloyd Valcarcel stating that the shooter was wearing a black hoodie with the hood up, white t-shirt, blue jeans, and black shoes. However, he could not identify the shooter because he did not get a good look at him, like Daniek Burns did); *id.* at 225 (Supreme explaining that he only had a second or two to look before he dropped to the ground and feigned death, but the shooter was wearing a big black hoodie with the hood up). While being interviewed on the scene, Tina Ashley pointed in Supreme's general direction and yelled "he knows who was shooting. They were shooting at him." N.T. Jury Trial, 8/4/14, at 141.

A warrant was issued for Appellant's arrest, and six days after the shooting, he turned himself in. Upon arrest, Appellant's black Jordan sneakers, belt, and blue jeans were taken from him and submitted for forensic testing. *See* N.T. Jury Trial, 8/5/14, at 356. The black hoodie that Appellant was wearing when arrested was later separately submitted for forensic testing. *Id.* at 295, 319-20. All of the items taken from Appellant matched some of the eyewitness accounts of what the shooter was wearing and tested either consistently with or positive for gunshot residue. *Id.* at 301, 325-30. Appellant's belt had by far the highest concentration of gunshot residue of all the items that were submitted, and the inside had markings consistent with "something rubbing up against it on a regular basis". *Id.* at 297, 325-26.

A federal grand jury proceeding was initiated against Appellant. N.T. Jury Trial, 9/13/06, at 41-57. However, before the grand jury had finished hearing testimony, the United States Attorney's Office decided that "the first jury to hear this case should be a jury from the court of common pleas of York where the homicide allegedly took place." N.T. Jury Trial, 9/13/06, at 46. Accordingly, the inquiry was concluded and Appellant proceeded to a jury trial in the York County Court of Common Pleas.

*Commonwealth v. Brenner*, 256 A.3d 38, 2021 WL 1978962, at *1-2 (Pa. Super. Ct. 2021).

Brenner was ultimately convicted in 2006 of first-degree murder, aggravated assault, and attempted homicide, and was sentenced to a term of life imprisonment without the possibility of parole and an additional consecutive term of five to ten years. *Id.* at *2. At this initial trial, the jury heard testimony from Daniek Burns, the eyewitness who identified Brenner as the shooter, as well as several defense witnesses who testified that they could not identify the shooter because of various conditions, such as poor lighting, distance, and the fact that the shooter wore a hood.

After the Pennsylvania Superior Court affirmed Brenner's conviction and sentence, Brenner filed a petition under Pennsylvania's Post-Conviction Relief Act ("PCRA"), arguing a host of issues. Ultimately,

the Pennsylvania Superior Court granted PCRA relief due to trial counsel's failure to discuss calling character witnesses on Brenner's behalf. *See Commonwealth v. Brenner*, 81 A.3d 1010 (Pa. Super. Ct. 2013). Accordingly, Brenner stood trial for a second time in 2014.

At this second trial, several witnesses who testified at the first trial in 2006 were unavailable to testify, and their prior testimony was read to the jury. One such witness was Daniek Burns, who was deceased at the time of trial in 2014. Prior to trial, defense counsel filed a motion *in limine* to exclude Burns' testimony, which was denied. Thus, Burns' prior testimony was read to the jury. In his testimony, Burns stated that he was, at that time, incarcerated in Rikers Island in New York for an attempted criminal possession drug charge; that he had no deals with law enforcement with respect to any pending charges; that he had various prior criminal charges and had active warrants at the time of the shooting; and that he had been smoking marijuana on the night of the shooting. (Doc. 1-3, PCRA Court Opinion, at 11-12). He further testified that he saw Brenner's face, and at the first trial, subsequently identified Brenner as the shooter in the courtroom. (*Id.* at 12).

Brenner's counsel presented the testimony of three witnesses in an attempt to rebut Burns' identification of Brenner as the shooter. Curiously, although Brenner's initial conviction and sentence were vacated based on prior counsel's failure to discuss calling character witnesses, Brenner did not call any character witnesses at this second trial.

Apollonia Snyder, Brenner's high school friend, also testified at the second trial. She stated that she was nervous to testify, but testified that a few days prior to the shooting, she was with Brenner in a car, and he was on his phone talking to someone about how he was going to "pop" Supreme, and he had a firearm in his lap while he was talking. (Doc. 1-3, PCRA Court Opinion, at 14-15). Ms. Snyder gave this information to Detective Fetrow after Snyder was facing open charges and Detective Fetrow had reached out to her regarding the shooting. (*Id.* at 15).

The jury also heard testimony from Allison Murtha, who provided expert testimony regarding gunshot residue analyses. (Doc. 1-3, PCRA Court Opinion, at 7). Ms. Murtha's organization had received Brenner's clothing that was taken from him upon his arrest and was tested for gunshot residue, and she testified that items of Brenner's clothing,

including his belt, jeans, and sneakers, contained evidence of gunshot residue that could only have come from the discharge of a firearm. (*Id.* at 7-8). She further testified on cross examination that there is always the potential for contamination, as gunshot residue could transfer from person to person or from one item of clothing to another. (*Id.*) Additionally, Ms. Murtha testified that there was no way to confirm when the gunshot residue particles were deposited on the clothing items, as Brenner was arrested, and the clothing was confiscated, six days after the shooting. (*Id.*)

Ultimately, Brenner was again convicted of first-degree murder, attempted murder, and aggravated assault, and he was sentenced to life without parole and an additional five to ten years in prison. He appealed his conviction and sentence, arguing that the verdict was against the weight of the evidence, challenging the sufficiency of the evidence, and raising evidentiary issues. *Brenner*, 2021 WL 1978962, at *3. The Superior Court affirmed, and the Pennsylvania Supreme Court denied his petition for allowance of appeal. *Id.*

Brenner subsequently filed a counseled PCRA petition, raising 16 allegations of ineffective assistance of counsel. Relevant to the instant

petition, Brenner challenged counsel's failure to: present expert testimony regarding eyewitness identification; present evidence showing that there had not been a full and fair opportunity to cross examine Daniek Burns at the first trial; object to the admission of gunshot residue evidence and expert testimony; effectively cross examine Detective Fetrow; present evidence regarding Brenner's lawful purchase of firearms and license to carry firearms, and other evidence to rebut the gunshot residue evidence; object to prejudicial statements in the prosecutor's closing argument; and present additional photographs showing the lighting at the crime scene. (*See* Doc. 1-3). After two days of evidentiary hearings, the PCRA court denied Brenner's petition. (*Id.*) Brenner appealed, and the Pennsylvania Superior Court upheld the denial of this PCRA petition on May 18, 2021. (*See* Doc. 1-4).

Brenner then filed the instant habeas petition on December 6, 2021. (Doc. 1). In this counseled petition, Brenner raises seven claims of ineffective assistance of counsel, as well as a claim that counsel's cumulative errors amounted to a denial of his right to due process. (*Id.*) On this score, Brenner challenges counsel's decision not to call an expert witness regarding eyewitness identification; counsel's failure to present

evidence showing that there was not a full and fair opportunity to cross examine Burns; the failure to adequately cross examine Detective Fetrow on a number of issues; counsel's failure to object to the prosecution's closing argument; counsel's decision not to present evidence which allegedly would have explained the presence of gunshot residue on the defendant's clothing; and counsel's failure to introduce additional photographs of the crime scene. Brenner additionally argues that the cumulative effect of counsel's errors denied him the right to a fair trial.

For their part, the respondents assert that Brenner's claims are without merit, as these claims were thoroughly considered and denied by the state courts. After review of the petition and the underlying state court record, we agree and find that Brenner's claims are without merit. Accordingly, we will deny Brenner's petition.

III.   <u>Discussion</u>

A. <u>State Prisoner Habeas Relief–The Legal Standard.</u>

(1)<u>Substantive Standards</u>

In order to obtain federal habeas corpus relief, a state prisoner seeking to invoke the power of this Court to issue a writ of habeas corpus

must satisfy the standards prescribed by 28 U.S.C. § 2254, which

provides in part as follows:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a
> district court shall entertain an application for a writ of
> habeas corpus in behalf of a person in custody pursuant to the
> judgment of a State court only on the ground that he is in
> custody in violation of the Constitution or laws or treaties of
> the United States.
>
> (b) (1) An application for a writ of habeas corpus on behalf of
> a person in custody pursuant to the judgment of a State court
> shall not be granted unless it appears that—
>
> (A) the applicant has exhausted the remedies available in the
> courts of the State;
> ..........
> (2) An application for a writ of habeas corpus may be denied
> on the merits, notwithstanding the failure of the applicant to
> exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254(a) and (b).

As this statutory text implies, state prisoners must meet exacting

substantive and procedural benchmarks in order to obtain habeas corpus

relief. At the outset, a petition must satisfy exacting substantive

standards to warrant relief. Federal courts may "entertain an application

for a writ of habeas corpus on behalf of a person in custody pursuant to

the judgment of a State court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States." 28

U.S.C. § 2254(a). By limiting habeas relief to state conduct which violates "the Constitution or laws or treaties of the United States," § 2254 places a high threshold on the courts. Typically, habeas relief will only be granted to state prisoners in those instances where the conduct of state proceedings led to a "fundamental defect which inherently results in a complete miscarriage of justice" or was completely inconsistent with rudimentary demands of fair procedure. *See e.g., Reed v. Farley*, 512 U.S. 339, 354 (1994). Thus, claimed violations of state law, standing alone, will not entitle a petitioner to § 2254 relief, absent a showing that those violations are so great as to be of a constitutional dimension. *See Priester v. Vaughan*, 382 F.3d 394, 401–02 (3d Cir. 2004).

### (2) Deference Owed to State Courts

These same principles which inform the standard of review in habeas petitions and limit habeas relief to errors of a constitutional dimension also call upon federal courts to give an appropriate degree of deference to the factual findings and legal rulings made by the state courts in the course of state criminal proceedings. There are two critical components to this deference mandated by 28 U.S.C. § 2254.

First, with respect to legal rulings by state courts, under § 2254(d), habeas relief is not available to a petitioner for any claim that has been adjudicated on its merits in the state courts unless it can be shown that the decision was either: (1) "contrary to" or involved an unreasonable application of clearly established case law; *see* 28 U.S.C. § 2254(d)(1); or (2) was "based upon an unreasonable determination of the facts," *see* 28 U.S.C. § 2254(d)(2). Applying this deferential standard of review, federal courts frequently decline invitations by habeas petitioners to substitute their legal judgments for the considered views of the state trial and appellate courts. *See Rice v. Collins*, 546 U.S. 333, 338–39 (2006); *see also Warren v. Kyler*, 422 F.3d 132, 139–40 (3d Cir. 2006); *Gattis v. Snyder*, 278 F.3d 222, 228 (3d Cir. 2002).

In addition, § 2254(e) provides that the determination of a factual issue by a state court is presumed to be correct unless the petitioner can show by clear and convincing evidence that this factual finding was erroneous. *See* 28 U.S.C. § 2254(e)(1). This presumption in favor of the correctness of state court factual findings has been extended to a host of factual findings made in the course of criminal proceedings. *See e.g., Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (per curiam); *Demosthenes*

*v. Baal*, 495 U.S. 731, 734–35 (1990). This principle applies to state court factual findings made both by the trial court and state appellate courts. *Rolan v. Vaughn*, 445 F.3d 671 (3d Cir.2006). Thus, we may not re-assess credibility determinations made by the state courts, and we must give equal deference to both the explicit and implicit factual findings made by the state courts. *Weeks v. Snyder*, 219 F.3d 245, 258 (3d Cir. 2000). Accordingly, in a case such as this, where a state court judgment rests upon factual findings, it is well-settled that:

> A state court decision based on a factual determination, ..., will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state proceeding. *Miller–El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 154 L.Ed.2d 931 (2003). We must presume that the state court's determination of factual issues was correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 285 (3d Cir. 2000).

*Rico v. Leftridge–Byrd*, 340 F.3d 178, 181 (3d Cir. 2003). Applying this standard of review, federal courts may only grant habeas relief whenever "[o]ur reading of the PCRA court records convinces us that the Superior Court made an unreasonable finding of fact." *Rolan*, 445 F.3d at 681.

### (3) Ineffective Assistance of Counsel Claims

These general principles apply with particular force to habeas petitions that are grounded in claims of ineffective assistance of counsel. It is undisputed that the Sixth Amendment to the United States Constitution guarantees the right of every criminal defendant to effective assistance of counsel. Under federal law, a collateral attack of a sentence based upon a claim of ineffective assistance of counsel must meet a two-part test established by the Supreme Court in order to survive. Specifically, to prevail on a claim of ineffective assistance of counsel, a petitioner must establish that: (1) the performance of counsel fell below an objective standard of reasonableness; and (2) that, but for counsel's errors, the result of the underlying proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 691-92 (1984). A petitioner must satisfy both of the *Strickland* prongs in order to maintain a claim of ineffective counsel. *George v. Sively*, 254 F.3d 438, 443 (3d Cir. 2001).

At the outset, *Strickland* requires a petitioner to "establish first that counsel's performance was deficient." *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001). This threshold showing requires a petitioner to

demonstrate that counsel made errors "so serious" that counsel was not functioning as guaranteed under the Sixth Amendment. *Id.* Additionally, the petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Id.* However, in making this assessment "[t]here is a 'strong presumption' that counsel's performance was reasonable." *Id.* (quoting *Berryman v. Morton*, 100 F.3d 1089, 1094 (3d Cir. 1996)).

But a mere showing of deficiencies by counsel is not sufficient to secure habeas relief. Under the second *Strickland* prong, a petitioner also "must demonstrate that he was prejudiced by counsel's errors." *Id.* This prejudice requirement compels the petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id.*

Thus, as set forth in *Strickland*, a petitioner claiming that his criminal defense counsel was constitutionally ineffective must show that his lawyer's "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "A fair assessment of

attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Thomas v. Varner*, 428 F.3d 491, 499 (3d Cir. 2005) (quoting *Strickland*, 466 U.S. at 689). The petitioner must then prove prejudice arising from counsel's failings. Moreover,

> [I]n considering whether a petitioner suffered prejudice, "[t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."

*Rolan*, 445 F.3d at 682 (quoting *Strickland*, 466 U.S. at 696) (internal quotations omitted).

Although sometimes couched in different language, the standard for evaluating claims of ineffectiveness under Pennsylvania law is substantively consistent with the standard set forth in *Strickland*. *See Commonwealth v. Pierce*, 527 A.2d 973, 976–77 (Pa. 1987); *see also Werts v. Vaugh*, 228 F.3d 178, 203 (3d Cir. 2000) ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted *Strickland* and thus was not 'contrary to' established Supreme Court precedent"). Accordingly, a

federal court reviewing a claim of ineffectiveness of counsel brought in a petition under 28 U.S.C. § 2254 may grant federal habeas relief if the petitioner can show that the state court's adjudication of his claim was an "unreasonable application" of *Strickland. Billinger v. Cameron*, 2010 U.S. Dist. LEXIS 63759, at *11, 2010 WL 2632286 (W.D. Pa. May 13, 2010). In order to prevail against this standard, a petitioner must show that the state court's decision "cannot reasonably be justified under existing Supreme Court precedent." *Hackett v. Price*, 381 F.3d 281, 287 (3d Cir. 2004); *see also Waddington v. Sarausad*, 555 U.S. 179, 190 (2009) (where the state court's application of federal law is challenged, "the state court's decision must be shown to be not only erroneous, but objectively unreasonable") (internal citations and quotations omitted).

This additional hurdle is added to the petitioner's substantive burden under *Strickland*, as the Supreme Court has observed a "doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (noting that the review of ineffectiveness claims is "doubly deferential when it is conducted through the lens of federal habeas"). This doubly deferential

standard of review applies with particular force to strategic judgment like those thrust upon counsel in the instant case. In this regard, the Court has held that:

> "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.*, at 688, 104 S. Ct. 2052. "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.,* at 689, 104 S. Ct. 2052. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.,* at 690, 104 S. Ct. 2052.

*Knowles v. Mirzayance*, 556 U.S. 111, 124, 129 S. Ct. 1411, 1420, 173 L. Ed. 2d 251 (2009). The deference which is owed to these strategic choices by trial counsel is great.

> Therefore, in evaluating the first prong of the *Strickland* test, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* The presumption can be rebutted by showing "that the conduct was not, in fact, part of a strategy or by showing that the strategy employed was unsound." *Thomas v. Varner,* 428 F.3d 491, 499-500 (3d Cir. 2005) (footnote omitted).

*Lewis v. Horn*, 581 F.3d 92, 113 (3d Cir. 2009).

It is against these legal benchmarks that we assess Brenner's petition.

### B. This Petition Will Be Denied.

As we have noted, Brenner asserts seven claims of trial counsel's ineffectiveness at his second trial which he asserts entitle him to habeas relief. However, after a review of the petition and the state court records, we find that Brenner's claims lack merit, and thus, do not entitle him to habeas relief. Accordingly, this petition will be denied.

### 1. Failure to Call an Expert Witness

Brenner's first claim asserts that his trial counsel was ineffective for failing to call an expert witness to testify regarding the vagaries of eyewitness identification. Indeed, in *Commonwealth v. Walker*, 92 A.3d 766 (Pa. 2014), which was decided before Brenner's second trial, the Pennsylvania Supreme Court held that expert testimony on this subject was no longer *per se* inadmissible but was admissible at the discretion of the trial court. At the PCRA hearing, Brenner called Dr. Dery Strange, who was qualified as an expert in eyewitness identification. (Doc. 1-3, PCRA Court Opinion, at 23). Dr. Strange testified to several conclusions regarding eyewitness identification. These conclusions included that

misidentification accounted for 70-75% of wrongful convictions; that short periods of time and dim lighting can prevent an accurate identification; and that the accepted measures for a reliable identification were lacking in Brenner's case. (*Id.* at 23-24). Brenner asserts that the jury would likely have disbelieved Burns' testimony and his identification of Brenner if his trial counsel would have called an expert to testify to such conclusions.

The PCRA court first found that this claim had arguable merit, as the eyewitness identification of Brenner was a highly contested issue in the case. (Doc. 1-3, PCRA Court Opinion, at 23). The court further determined that a finding could be made that counsel lacked a reasonable basis for failing to call such an expert. (*Id.*) However, the court ultimately determined that Brenner could not show prejudice such that the outcome of his case would have been different had an expert witness testified. (*Id.* at 24-25). On this score, the court discussed the "other damning testimony" elicited at trial, such as Ms. Snyder's testimony that she heard Brenner threaten to "pop" Supreme several days before the shooting and testimony that indicated Supreme was likely the target of the shooting. (*Id.* at 25-26). In addition, the Court noted the evidence

indicating that there was gunshot residue on Brenner's clothing, as well as several descriptions of the shooter by various witnesses, some of which matched Brenner's build. (*Id.* at 26). Thus, the PCRA court found that Brenner did not suffer prejudice and denied this claim.

The Superior Court agreed. (Doc. 1-4, Superior Court Opinion, at 16-20). In affirming the denial of this claim, the Superior Court reasoned that while trial counsel made no attempt to call an expert on this subject despite the fact that the eyewitness identification was contested, counsel "did not rely solely on cross-examination and closing argument to convey the relevant eyewitness factors to the jury." (*Id.* at 19). In addition, counsel called three fact witnesses, all of whom were standing near Burns during the shooting and testified that they could not identify the shooter due to various conditions, such as the lighting, distance, and the short time in which they had to see the shooter. (*Id.*) As the court pointed out, one of these witnesses testified that Burns stated after-the-fact that he was actually unable to identify the shooter. (*Id.*) The court then went on to note the other evidence of Brenner's guilt, including the testimony of his motive to shoot Supreme and the gunshot residue on his clothing. (*Id.*

at 19-20). Ultimately, the court concluded that Brenner suffered no prejudice from counsel's failure to call an expert witness. (*Id.* at 20).

After consideration, we cannot conclude that the state courts' determinations were contrary to law or based on an unreasonable determination of the facts. Rather, the state courts carefully considered this claim and determined that, although counsel could have been found to have rendered ineffective assistance by failing to call an expert, Brenner suffered no prejudice. At the outset, while *Walker* permitted the use of expert testimony regarding eyewitness identification, it does not follow that counsel is *per se* ineffective when counsel fails to call an expert in this setting.

Moreover, as the courts noted, Burns was an imperfect witness. The jury was aware of his prior criminal history, his active warrants at the time of the shooting, and the circumstances surrounding his identification of Brenner, including that he had smoked marijuana and was some distance from the shooter. To rebut his identification of Brenner, trial counsel called three fact witnesses, all of whom testified that they were near Burns during the shooting yet could not identify the shooter. In addition, circumstantial evidence presented by the

Commonwealth indicated that Brenner had a motive to shoot Supreme, that Supreme was likely the target of the shooting, and that Brenner had gunshot residue on his clothing. Given this other evidence of Brenner's guilt, the state courts found that there was no real probability that the outcome of his trial would have been different had an expert been called. We find no error in the state court decisions here. Accordingly, this claim does not afford Brenner relief.

### 2. Failure to Ensure a Full and Fair Cross Examination of the Eyewitness

Brenner next asserts that his trial counsel was ineffective for failing to argue that Burns had not been fully and fairly cross examined at the first trial, and thus, his testimony should have been precluded at the second trial because he was unavailable. This claim is premised on Brenner's belief that Burns was receiving favorable treatment by the Commonwealth at the time of Brenner's first trial, as Burns had allegedly been stopped with drugs in York and subsequently fled from police, but no charges were ever filed. Detective Fetrow testified to Burns' flight in front of a federal grand jury, but this testimony was never introduced. Burns did not testify to this incident at the first trial, and second trial counsel failed to elicit this information from Detective Fetrow on retrial

or introduce evidence of the grand jury testimony. Thus, Brenner contends that the admission of Burns' prior testimony violated his rights under the Confrontation Clause, and that both initial counsel and retrial counsel were ineffective for failing to preclude Burns' testimony or otherwise bring the issue to light.

The state courts determined that Brenner suffered no prejudice from the failure to elicit the testimony regarding Burns' flight from police or lack of charges brought, and further found that Burns' testimony was properly admitted in the second trial. At the PCRA level, the court found that while there was some merit to the claim that counsel failed to elicit testimony from either Burns or Detective Fetrow regarding the lack of charges for a drug stop, the court further found that Brenner suffered no prejudice:

> We cannot say that it would have for the simple fact that, unlike in the cases cited by the defense, the jury was aware of numerous involvements that Mr. Burns had with law enforcement and Mr. Burns testified that he had no deals with any law enforcement agents. The jury was arguable deprived of just one instance, which may well have been an oversight by all defense counsel and the Commonwealth in light of the surfeit of crime that Mr. Burns was involved in. However, as we recounted in the facts section, defense counsel did elicit from Mr. Burns that he was selling drugs in York. And, critically, we note that Mr. Burns' testimony indicated that he told the authorities where he could be located if he did not

show up, which, seemingly, addresses Detective Fetrow's questioning regarding the reason Mr. Burns had to run from authorities.

. . . . . . . .

While the preceding does not directly address Mr. Burns fleeing from police on a particular day when he was found to possess drugs, to this Court's mind, it addresses his flight from police in general as a desire to safeguard himself in York as a result of the case *sub judice*. Mr. Burns had provided authorities with a description of where he could be found if he did not show up and Mr. Burns testified that this flight was caused by his fear of street reprisal related to the case in question. There could be no greater chance of success were the jury to have been aware of Detective Fetrow's revelation that he was unsure of why Mr. Burns fled. Mr. Burns already provided the reason in an unrelated answer to the jury.

(Doc. 1-3, PCRA Court Opinion, at 34-35).

Additionally, the court noted that the jury was already aware that investigators failed to arrest Burns on either of the two active warrants he had at that time, or for his new criminal conduct of possessing a bulletproof vest. (Doc. 1-3, PCRA Court Opinion, at 36). The court further recounted the circumstantial evidence that supported Brenner's conviction, including evidence of motive and several descriptions of the shooter matching Brenner's build and clothing. (*Id.*) Accordingly, the court concluded that the failure to elicit another instance of the

Commonwealth potentially overlooking Burns' criminal activity would not have led to a different outcome for Brenner. (*Id.*) Thus, the court held that initial trial counsel was not ineffective, and retrial counsel was not ineffective for failing to incorporate Detective Fetrow's statement into the record to support a claim of trial counsel's ineffectiveness. (*Id.*)

On appeal, the Superior Court agreed that Brenner had failed to establish that trial counsel was ineffective in his cross examination of Burns. On this score, the court noted that Brenner had not called initial trial counsel at the evidentiary PCRA hearing, and thus, counsel was never given the opportunity to explain his trial strategy. (Doc. 1-4, Superior Court Opinion, at 15). Accordingly, the Superior Court held that because Brenner failed to establish trial counsel's ineffectiveness, the trial court did not err in permitting Burns' testimony at the second trial. (*Id.* at 15-16). The court further held that because initial trial counsel was not shown to be ineffective, retrial counsel was not effective for failing to raise this issue in his initial PCRA petition. (*Id.* at 16).

Given this thorough discussion and reasoning by the state courts, we cannot conclude that the state courts' determinations were contrary to law or based on an unreasonable determination of the facts. Rather,

the state courts engaged in a thorough analysis and concluded that Brenner's attorneys were not ineffective, and that the trial court did not abuse its discretion when it permitted Burns' testimony on retrial. Accordingly, this claim does not warrant habeas relief.

### 3. Failure to Adequately Cross Examine Detective Fetrow

Brenner also challenges his counsel's cross examination of Detective Fetrow regarding several other matters in addition to the matter of Burns' flight from police and his motive to lie. On this score, Brenner asserts that counsel failed to adequately cross examine Detective Fetrow regarding Tina Ashley's identification of the shooter's target, as well as the timeline in which Brenner's sweatshirt was seized by authorities.

With respect to the claim that counsel failed to cross examine Detective Fetrow regarding Burns' motive to lie, we conclude as we did above that Brenner has not demonstrated his counsel was ineffective on this score. Indeed, as we have noted, the state courts thoroughly considered this claim and found that, given the myriad of other evidence against him, the failure to cross examine Detective Fetrow regarding Burns' motive to lie would not have led to a different outcome. In fact, the

state courts explained that the jury had heard evidence regarding Burns'
motive to lie, including the fact that he had active warrants at the time
he was questioned about this incident. Accordingly, this claim has no
merit.

The courts also considered Brenner's claim that counsel failed to
cross examine Detective Fetrow about Tina Ashley's identification of the
shooter's intended target. On retrial, Detective Fetrow testified that Ms.
Ashley identified the target as Supreme, or Jeffrey Mable. Brenner
contends that Ashley's excited utterance, which was omitted on retrial,
actually indicated that she was pointing toward a group of people and not
Mr. Mable specifically. Accordingly, he argues that counsel should have
cross examined Detective Fetrow regarding his certainty that Ms. Ashley
identified Mr. Mable as the target.

The PCRA court considered this claim and found that counsel was
not ineffective on this score:

> The potential targeting of Mr. Mable is but one fact in the trial
> and not a determinative one. The use of a firearm to target
> *someone* is sufficient to undergird transferred intent for a
> first-degree murder charge. There is evidence of the
> Defendant's intent to target Mr. Mable, via Apollonia
> Snyder's testimony that the Defendant stated he was going to
> kill Mr. Mable. And there is evidence of the Defendant's
> motive to target Mr. Mable, via testimony that the Defendant

was evasive regarding who shot him prior to the murder of Ms. Witter. Detective Fetrow's testimony merely supplied Ms. Ashley's excited utterance that Mr. Mable, amongst others, knew they were being shot at. Detective Fetrow seems to have narrowed Ms. Ashley's identification of targets down to just one; however, the other evidence of the trial points to the Defendant having motive and intent regarding Mr. Mable. We do not believe arguable merit has been sufficiently made out.

(Doc. 1-3, PCRA Court Opinion, at 40). The court went on to find that given the other evidence of Brenner's guilt, Brenner suffered no prejudice from counsel's failure to cross examine Detective Fetrow about this matter. (*Id.*, at 40-41).

The Superior Court agreed. (Doc. 1-4, Superior Court Opinion, at 31-32). In its decision affirming the denial of Brenner's PCRA petition, the court additionally noted that Mable testified at the second trial that he did not know who was the shooter's target. (*Id.\* at 31). Thus, the court concluded that this testimony significantly reduced the probative value of Ashley's excited utterance that Mable was the target, and habeas relief was not warranted. (*Id.* at 32).

The state courts similarly found no merit to Brenner's claim concerning the failure to cross examine Detective Fetrow about the sweatshirt and the timeline in which it was seized. Regarding this claim, Brenner asserts that counsel should have questioned Detective Fetrow

regarding his passing admission that Brenner's sweatshirt was not seized and tested until sometime after it had been handled by correctional staff following Brenner's arrest, which could have allowed for contamination. In support of this claim, Brenner submitted articles that discussed the apparent ease of contamination in cases involving gunshot residue.

The PCRA court held that Brenner did not show a substantially greater chance of success had the jury been aware of the conclusions set forth in these articles. (Doc. 1-3, PCRA Court Opinion, at 42). The court noted that the expert who testified at trial, Ms. Murtha, testified that there was not a substantial amount of gunshot residue on the sweatshirt, and further testified that particulate loss could occur with temporal delays. (*Id.*) The court further recognized that, disregarding the sweatshirt, Brenner's other items of clothing were covered in gunshot residue and associated particles. (*Id.*) Accordingly, the court found that counsel's actions did not lack a reasonable basis, and moreover, that Brenner was not prejudiced. (*Id.* at 42-43).

On appeal, the Superior Court agreed. On this score, the court recounted the evidence of gunshot residue on Brenner's shoes and belt,

which was collected within minutes of him being taken into custody. (Doc. 1-4, Superior Court Opinion, at 33). The court further noted Ms. Murtha's testimony regarding the dissipation of gunshot residue after time. (*Id.*) However, the court reasoned that the jury was aware the sweatshirt did not have three-component gunshot residue, and thus, its main relevance was that it matched the description of the sweatshirt the shooter wore, rather than the presence of gunshot residue. (*Id.*) Accordingly, the court found that it was not likely that cross examining Detective Fetrow on this issue would have led to a different outcome. (*Id.*)

Given the thorough treatment of these issues by the state courts, we cannot conclude that their determinations were contrary to law or based on an unreasonable determination of the facts. Indeed, the record supports the state courts' conclusions that counsel was not ineffective for failing to cross examine Detective Fetrow about these matters, and further, that Brenner suffered no prejudice. On this score, the record indicates that the jury was aware of Burns' motive to lie and the Commonwealth's purported overlooking of his criminal conduct; of Ms. Ashley's purported identification of Mable as the target and Mable's testimony that he was unaware of who the target was; and of the

potential for contamination of gunshot residue. Armed with this knowledge, the jury nonetheless found that there was enough evidence presented at trial to convict Brenner of first-degree murder. We find no error in the state courts' decisions, and as such, this claim does not entitle Brenner to habeas relief.

### 4. <u>Failure to Object to the Admission of Gunshot Residue Reports and Expert Testimony</u>

Brenner's next claim asserts that counsel failed to object to the admission of two expert reports regarding gunshot residue and the testimony of Ms. Murtha as a gunshot residue expert. This claim is premised on Brenner's assertion that the first gunshot residue report was written by someone other than Ms. Murtha, and thus, it should not have been admitted at the second trial because the initial expert was unavailable. Further, Brenner argues that counsel should have objected to Ms. Murtha's report and her testimony as an expert witness because her findings and testimony were based on the prior expert's reports rather than her own, and thus, the admission of this evidence violated his rights under the Confrontation Clause.

The PCRA court considered this claim and found that the initial expert report rendered by A.J. Schwoeble, who did not testify at the first

trial and was unavailable at the time of the second trial, should not have been admitted. (Doc. 1-3, PCRA Court Opinion, at 91). Regarding Ms. Murtha's testimony and report, the court analyzed the admission of this evidence under *Bullcoming v. New Mexico*, 564 U.S. 647 (2011) and *Commonwealth v. Yohe*, 79 A.3d 520 (Pa. 2013), and ultimately found that Murtha's testimony and report were admissible and did not violate the Confrontation Clause.

In *Bullcoming*, the Supreme Court of the United States found that the use of a "surrogate analyst" with no connection to the report at issue to testify to another analyst's findings violated the Confrontation Clause. *Bullcoming*, 564 U.S. at 652. The testifying analyst in *Bullcoming* did not perform the tests contained in the certification introduced at trial and did not sign the certification; he merely read another analyst's findings into the record. *Id.* In *Yohe*, which the PCRA court ultimately relied on, the Pennsylvania Supreme Court distinguished *Bullcoming* from the facts of its case. *Yohe*, 79 A.3d at 541. In that case, a toxicology report containing the defendant's blood alcohol content was introduced into evidence, and an expert testified as to the contents and results of the report. *Id.* at 539-40. While the expert did not collect the raw data used

to ultimately determine the defendant's blood alcohol content, he "reached the conclusion in the Toxicology Report based on his analysis of the raw data, certified the results, and signed his name to them." *Id.* at 540. The *Yohe* court held that this testimony was different from that in *Bullcoming* because the expert in *Yohe* reached his own independent conclusions and wrote his own report. *Id.* at 541. Thus, this expert was the appropriate witness to testify and be cross examined at trial. *Id.*

In light of *Yohe*, while the PCRA court opined that Murtha's testimony seemed more akin to the disallowed "surrogate" in *Bullcoming*, it nonetheless held that because Murtha created her own report and testified to her own conclusions, there was no Confrontation Clause violation in Brenner's case. (Doc. 1-3, PCRA Court Opinion, at 94). On appeal, the Superior Court agreed that the initial expert report prepared by Mr. Schwoeble should not have been admitted, but that there was no Confrontation Clause violation with respect to Murtha's report and testimony. (Doc. 1-4, Superior Court Opinion, at 22-26). The Superior Court opined that Murtha's report and testimony fit squarely into the *Yohe* analysis, in that although she did not collect the raw data underlying the report, she performed an analysis and came to her own

34

independent conclusions that she then testified to. (*Id.* at 24-25). The court further held that Brenner had not shown that his counsel was ineffective for failing to object to the admission of Schwoeble's report because the report was merely cumulative of Murtha's report, which was properly admitted. (*Id.* at 26-27).

After consideration, we cannot conclude that the state courts' decisions were contrary to law or based on an unreasonable determination of the facts. The courts explained that based on *Yohe*, because Ms. Murtha's report contained her own independent conclusions and opinions and did not simply parrot Mr. Schwoeble's report, the report and her testimony were admissible. Further, although the courts found that the admission of Schwoeble's report was error, the error was deemed harmless because his report was cumulative of Murtha's report, and thus he suffered no prejudice from its admission. Accordingly, given this thorough discussion by the state courts, we cannot conclude that this claim entitles Brenner to habeas relief.

### 5. <u>Failure to Present Evidence to Explain Gunshot Residue on the Defendant's Clothing</u>

Brenner further asserts that his counsel was ineffective for failing to introduce evidence at trial that would have, in his view, innocently

35

explained the presence of gunshot residue on his clothing. Brenner contends that counsel should have introduced evidence showing that he was a lawful gun owner, that he had a license to carry a firearm, and evidence of a second sweatshirt owned by Brenner that that also had gunshot residue particles on it. Brenner argues that this evidence would have innocently explained why his clothing contained particles of gunshot residue.

The PCRA court addressed this claim and found that it did not afford Brenner relief. As to the evidence of Brenner's lawfully purchased firearms, counsel testified at the PCRA hearing that he did not introduce this evidence because he did not want to put a gun in Brenner's hands. (Doc. 1-3, PCRA Court Opinion, at 44). Counsel further testified that he had not considered the issue of presenting the second sweatshirt, but that he could see it cutting both ways and could not guess what a jury would have done with that evidence. (*Id.*) The PCRA court found that counsel had a reasonable basis for not introducing these items into evidence, reasoning that the evidence had the potential to either provide an innocent explanation for the gunshot residue or cause harm to the defendant's case. (*Id.*) The court further found that Brenner suffered no

prejudice given the other evidence of his guilt. (*Id.* at 46). The Superior Court agreed, finding that counsel's decision to not introduce these items was a reasonable strategy. (Doc. 1-4, Superior Court Opinion, at 34-35).

We cannot conclude that these decisions were contrary to law or based on an unreasonable application of the facts. The state courts thoroughly explained that counsel had a reasonable basis for not introducing these pieces of evidence, and thus was not ineffective. Indeed, retrial counsel stated that he chose not to introduce these items— evidence of legally-owned firearms and a sweatshirt containing gunshot residue particles—into evidence because he thought they had the potential to harm Brenner's case. Accordingly, we cannot conclude that the state courts unreasonably applied *Strickland*, and this claim does not afford Brenner relief.

### 6. <u>Failure to Object to the Prosecution's Closing Argument</u>

Brenner next asserts that his retrial counsel was ineffective for failing to object to several statements made by the prosecutor in closing argument. Specifically, the defendant points to seven comments made by the prosecutor in his closing, which Brenner claims were false statements or statements regarding the credibility of the witnesses. The state courts

addressed these claims and found no merit. We will address each claim in turn.

### a. Statements characterizing Apollonia Snyder's Testimony

First, Brenner takes issue with the prosecutor's statements characterizing Snyder as "nervous" while testifying. He also argues that the prosecutor improperly stated that Snyder volunteered information about Brenner to the police. In his closing argument, the prosecutor remarked that Snyder was nervous because she was "facing a guy who's now on trial for a murder that she knows did it." (Doc. 1-3, PCRA Court Opinion, at 59). At the PCRA level, Brenner argued that this statement was inconsistent with Snyder's testimony regarding the threat she heard while in the car with Brenner.

The PCRA court found no merit to this claim. The court recognized that Snyder indicated that she was nervous and found that the prosecutor was asking the jury to draw a reasonable inference that she was nervous because she had heard Brenner threaten Supreme's life while handling a firearm. (Doc. 1-3, PCRA Court Opinion, at 59). The court also recognized that Snyder testified that coming forward was "the right thing to do," implying that she believed Brenner was the shooter.

(*Id.*) The court held the prosecutor's statement was a permissible inference given Snyder's testimony. (*Id.*) The Superior Court agreed, finding that the prosecution's statement was a reasonable inference drawn from Snyder's testimony, and Brenner's counsel was not ineffective for failing to object. (Doc. 1-4, Superior Court Opinion, at 40).

We cannot conclude that the state courts' determinations were erroneous. Snyder testified that she heard Brenner threaten Supreme's life while holding a firearm and stated that she was nervous to testify. The prosecutor's statement to the jury that Snyder knew who the killer was constituted a permissible inference drawn from Snyder's own testimony. Accordingly, counsel was not ineffective for failing to object, and Brenner is not entitled to relief.

Brenner also argues that the prosecutor made false statements to the jury about Snyder volunteering information to the police. He contends that this statement mischaracterized the facts to the jury because Snyder did not volunteer information until Detective Fetrow reached out to her. The PCRA court first acknowledged that this statement was likely in response to defense counsel's statement that Snyder never came forward to the police. (Doc. 1-3, PCRA Court Opinion,

at 62). The court also noted that Detective Fetrow's cross-examination revealed that he contacted Snyder, who then volunteered information about Brenner. (*Id.* at 61-62). Thus, the court found that counsel was not ineffective for failing to object to this statement, and Brenner suffered no prejudice because the jury was instructed that counsel's statements were not evidence. (*Id.* at 63). The Superior Court agreed. (Doc. 1-4, Superior Court Opinion, at 41). The court reasoned that the prosecutor's remark was not the type of intentional misstatement that Brenner claimed, and that Brenner had not shown how this comment had prejudiced the jury against him. (*Id.* at 41-42).

We find no error here. The state courts explained that the prosecutor's characterization of Snyder coming forward was a permissible statement in response to defense counsel's attempt to make it appear that Snyder was coaxed into coming forward. Moreover, Brenner has not shown that he suffered any prejudice because of counsel's failure to object to this statement. Accordingly, this claim affords Brenner no relief.

### b. Statements regarding Tina Ashley's Testimony

Next, Brenner challenges statements made by the prosecution concerning Tina Ashley's testimony. Specifically, he argues that the prosecution made false statements concerning Ashley's ability to see Supreme during the shooting; made a false statement that Ashley saw Burns run past her after the shooting; and improperly commented on her familiarity with Brenner.

The PCRA court found that none of these claims warranted relief. (Doc. 1-3, PCRA Court Opinion, at 63-70). Regarding the statement that Ashley was able to see Supreme during the shooting, the court found that the prosecutor was simply characterizing the evidence based on inferences that could be drawn from Ashley's testimony. (*Id.* at 64). With respect to the statement that Ashley saw Burns running past her, the court found that this statement was also a reasonable inference drawn from the testimony of both Ashley and Burns. (*Id.* at 65-67). The court further found that the prosecutor's remark regarding Ashley's friendly demeanor toward Brenner during the trial was permissible, as it highlighted conflicting testimony that suggested Ashley did not know Brenner that well. (*Id.* at 69-70). On appeal, the Superior Court agreed,

finding that these statements by the prosecution in its closing argument were permissible, and accordingly, counsel was not ineffective for failing to object. (Doc. 1-4, Superior Court Opinion, at 42-44).

Given this thorough analysis by the state courts, we cannot conclude that these decisions were contrary to law or based on an unreasonable determination of the facts. Rather, the courts found that these statements by the prosecution were permissible, in that they were based on reasonable inferences that could be drawn from the testimony elicited at trial. Accordingly, counsel could not be deemed ineffective for failing to object to these statements, and Brenner is not entitled to relief on this claim.

### c. Statement pertaining to Lloyd Valcarcel's Testimony

Next, Brenner challenges his counsel's failure to object to the prosecutor's characterization of Lloyd Valcarcel's testimony. In his closing, the prosecutor recounted Valcarcel's testimony and regarded Valcarcel as someone who "couldn't tell the truth if his life depended on it." (Doc. 1-3, PCRA Court Opinion, at 72) (citations to the record omitted). The prosecutor went on to highlight Valcarcel's testimony in which he definitively stated that Brenner was not the shooter, which

conflicted with his written statement to police that he did not know if Brenner even knew about the shooting. (*Id.* at 72-73). Brenner contends that this statement by the prosecutor impermissibly spoke to Valcarcel's credibility.

The PCRA court found that this claim was without merit. (Doc. 1-3, PCRA Court Opinion, at 73). The court emphasized that this statement by the prosecutor merely highlighted what the jury already knew based on the evidence produced at trial—that Valcarcel either lied in his written statement or lied when he definitively stated that Brenner was not the shooter. (*Id.*) Accordingly, based on the relevant caselaw, the court found that this statement was not unduly prejudicial to Brenner. (*Id.*) (discussing *Commonwealth v. Carpenter*, 515 A.2d 531, 536 (Pa. 1987)). The Superior Court agreed, finding that the conclusion of the PCRA court was supported by caselaw and by the record. (Doc. 1-4, Superior Court Opinion, at 45).

We cannot conclude that the state courts erred in their determinations. The courts' well-reasoned opinions set forth the relevant caselaw and established that the prosecutor's remarks regarding Valcarcel's testimony were permissible. Accordingly, Brenner's counsel

could not be deemed ineffective for failing to object to the remark. This claim does not afford Brenner relief.

### d. Statement characterizing Brenner as "about as Cold a Killer as there Exists"

Finally, Brenner argues that the prosecutor's statement characterizing Brenner as "about as cold a killer as there exists" amounted to inflammatory name-calling and was inherently prejudicial. The PCRA court, applying the relevant law, determined that this statement was based upon the underlying facts and related to an underlying element of the crime Brenner was charged with—specific intent to kill. (Doc. 1-3, PCRA Court Opinion, at 77) (discussing *Commonwealth v. Clancy*, 192 A.3d 44 (Pa. 2018)). Thus, while the court recognized that such characterizations are not always permissible, in the instant case, the prosecutor's remark comported with the facts presented and highlighted Brenner's premeditation and specific intent to kill. (*Id.*) Accordingly, the court concluded that counsel was not ineffective for failing to object to this statement. (*Id.*) The Superior Court agreed, reasoning that this remark was permissible under *Clancy* and characterizing the prosecutor's remark as "an isolated use of oratorical flair." (Doc. 1-4, Superior Court Opinion, at 47-49).

Based on the foregoing, we cannot conclude that these state court determinations were erroneous. Rather, applying relevant caselaw, the courts found that this remark by the prosecutor was permissible under the circumstances. Accordingly, Brenner's counsel was not ineffective for filing to object, and this claim affords him no relief.

### 7. <u>Failure to Present Additional Photographs of the Crime Scene</u>

Brenner's final substantive challenge concerns his counsel's failure to introduce additional photographs into evidence to depict the lighting at the crime scene. At the PCRA level, the court first noted that there were several photographs admitted into evidence showing the lighting at the crime scene, and several witnesses gave conflicting accounts of the lighting at the scene. (Doc. 1-3, PCRA Court Opinion, at 55-56). Accordingly, after viewing the photographs in question the court found that the additional photographs would have been cumulative and introducing them at trial would not have led to a substantially greater chance of success at trial. (*Id.*) The court further found that Brenner suffered no prejudice given the other evidence of his guilt, including eyewitness testimony and gunshot residue evidence. (*Id.* at 57). The Superior Court agreed, reasoning that the jury heard testimony from

various witnesses regarding the lighting conditions at the scene and saw photographs of the scene, and thus, the additional photographs would have been cumulative. (Doc. 1-4, Superior Court Opinion, at 53-54).

We find no error in the state courts' determinations. The record supports the courts' conclusions that additional photographs of the crime scene would have been cumulative, as there were photographs introduced and several witnesses who testified as to the lighting conditions. Thus, it was within the province of the jury to determine who to credit to determine the lighting conditions the night of the shooting, and additional photographs would not have resulted in a different outcome for Brenner. Accordingly, his counsel cannot be deemed ineffective on this score, and this claim does not warrant relief.

### 8. Cumulative Errors

As a last-ditch effort, Brenner asserts that the cumulative effect of counsel's errors prejudiced him such that he was denied a fair trial. However, this claim also fails as a matter of law, as we have found that Brenner's counsel did not render ineffective assistance. *See Aponte v. Eckard*, 2016 WL 8201308, at *20 (E.D. Pa. June 3, 2016) ("The cumulative error doctrine requires the existence of 'errors' to aggregate.

Absent such errors by counsel, the cumulative error doctrine does not apply"). Accordingly, because we have concluded that Brenner's counsel was not ineffective, this claim of cumulative errors does not entitle him to habeas relief.

Finally, we have carefully considered whether Brenner is entitled to a certificate of appealability under 28 U.S.C. § 2253. As the Supreme Court observed "the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484, (2000). Here, we conclude that Brenner has made no such showing, nor can he in light of the state court findings and clear evidence of his factual guilt. Accordingly, a certificate of appealability will not issue in this case.

## IV. Conclusion

Accordingly, for the foregoing reasons, the petition for a writ of habeas corpus in this case will be DENIED, and a certificate of appealability will not issue.

An appropriate order follows.

47

_s/ Daryl F. Bloom_
Daryl F. Bloom
United States Magistrate Judge

DATED: October 3, 2023